MARCARIO ALARCON v. THE STATE.

No. 3062.   Decided December 7, 1904.

**1.—Murder in the Second Degree—Evidence—Change of Venue.**

Where on a motion for change of venue, on an indictment for murder, the defendant proposed to show that the district judge, who had previously granted defendant a continuance, was beaten in the election held thereafter two to one in the county of the trial by his opponent who was private prosecuting attorney in the case, to show what effect the continuance of said case had upon the voters of said county and the feelings which were engendered among them in the campaign towards defendant, it was error to exclude such testimony.

**2.—Same—Prejudice Against Defendant.**

See evidence stated in the opinion upon which it is held the venue should have been changed, on the ground that so great a prejudice existed in the county of the trial against defendant, charged with murder, as to render it improbable that he could get a fair and impartial trial.

**3.—Same—Charge of the Court—Murder in Second Degree—Manslaughter.**

See opinion for criticism of the court's charges on murder in the second degree and manslaughter as somewhat complicated, and the suggestion as to the law applicable to the facts which the court should charge in another trial.

Appeal from the District Court of Coleman.   Tried below before Hon. Jno. W. Goodwin.

Appeal from a conviction of murder in the second degree; penalty, twelve years imprisonment in the penitentiary.

The principal State's witness, Holbert, testified substantially that deceased, Horace Garrett, and witness were together going north on the west side of the street in Coleman, in front of J. B. Warren's store. "Just as we were at the south edge of Warren's corner, we met two persons; I could not tell who they were until they spoke, then I knew they were Mexicans. One was longer than the other; the smaller one was next to us. I was on the outside and Garrett was next to the smaller Mexican; and the larger Mexican was next to the wall. Just as we met, the smaller Mexican bumped against Garrett; the latter stopped and turned around and said, 'What do you think?' The Mexicans stopped as soon as Garrett spoke—they were then five or six steps from us—and the smaller Mexican said, 'What do you think?' Then Garrett said, 'I think you are a d—m fool,' and the smaller Mexican said, 'You are, too;' then Garrett walked back to where they were and attempted to strike the smaller Mexican. I could not tell whether Garrett had anything in his hand or not, I did not see anything. Both the smaller Mexican and Garrett were standing in a position to strike, and attempting to strike each other. The defendant was standing behind Garrett, and a little to the right, and went up to him from the right and rear and struck him. I could not see anything in defendant's hand. I thought he struck Garrett about the right shoulder. Just at that time Garrett groaned and staggered and hollered, 'help.' When Garrett called for help, I ran to where they were and the Mexicans moved back, the smaller one remaining closer to me. I made at the smaller one, who threw a rock at me; I picked up the same rock and threw it back at him, and stooped over looking for another rock, when the defendant came up behind me and stuck a knife in my back; it struck my back bone and bent the blade. I did not see any knife that night, but the knife I saw in court had the blade bent. I never saw Garrett strike or attempt to strike defendant.   *   *   *   Garrett was not drunk that night, neither was I." The city marshal, who heard the disturbance, arrived on the scene shortly after the difficulty, arrested defendant and found his knife lying near the place where the fight occurred.

Defendant testified that he stepped in between the deceased and the other Mexican, Fernandez, thought deceased had a pistol and was going to strike his friend. Deceased struck defendant on the neck with something he had in his hand. Fernandez started to run and defendant struck deceased with his fist and kept stepping back and deceased kept striking him. Defendant picked up a rock and threw it at Garrett and about that time Holbert ran up behind him and threw a rock at defendant, defendant dodged down when Garrett struck at him again, and he threw up his hands to keep Garrett from hitting him with what he had in his hand, and defendant stuck his knife in Garrett and saw Holbert getting another rock to throw and defendant reached back

and stabbed him. Defendant turned and struck at Garrett again and Garrett grabbed defendant's hand and drew back as though he was going to shoot and defendant dropped his knife and ran. Fernandez the smaller Mexican, corroborated Holbert, the State's witness, to the point where Garrett approached him; he then testified that Garrett attempted to hit him with a whisky bottle and Fernandez jumped off the sidewalk looking for a rock. "When I got up, the defendant was between us and said something to Garrett and Garrett replied, all of which I did not hear; then Garrett struck at defendant with the bottle and knocked his hat off; defendant stooped down and picked up his hat and a rock and threw the rock at Garrett; then they got close together. I could not see them striking. I heard defendant stab Garrett three times. Holbert did not come to where they were fighting until Garrett said, 'help,' he, Holbert, ran up close to them and was picking up a rock when defendant stabbed him in the back." This, with the facts on the question of change of venue, as contained in the opinion, is a sufficient statement of the case.

No brief for appellant has reached the hands of the reporter.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twelve years; hence this appeal.

Appellant questions the action of the court refusing to change the venue. The grounds alleged being that a formidable combination existed in Coleman County of influential citizens against appellant, and that so great a prejudice existed in said county against him as to render it improbable that he could get a fair and impartial trial. As to the first proposition it is not necessary to discuss it, as the only evidence relating to that matter is to the effect that appellant's father and some other relatives interested themselves in the prosecution; and that they employed able counsel to prosecute the case. On the subject of prejudice, a number of witnesses were introduced, who testified pro and con. There is some evidence to the effect that after the homicide there was considerable excitement about the town of Coleman where it occurred. There is testimony showing that the sheriff removed appellant from the jail of said Coleman County, to another county, in apprehension of a mob. However, no witness testifies directly that any mob was formed. There is testimony tending to show that on the night of the homicide, and during the excitement, something was said about getting up a mob, and one witness testified that he was aroused at home and asked to come down and join a party to mob appellant. At the term of the court succeeding the homicide, appellant was indicted and his case was continued by the court. On that occasion there was considerable excitement in the court-room and about the courthouse. Defendant's counsel testified to overhearing conversations in

which certain parties threatened him with violence for procuring a
continuance. It is also shown that a crowd of people gathered at
the court-house steps and created some excitement. But it is not shown
in this connection that anything was said or done, looking to violence
toward the prisoner. It is suggested that the people gathered around
some of the relatives of deceased at the court-house steps, who were
crying and talking about the court having continued the case. It was
further shown that, after this continuance, there was a contest for the
office of district judge in the judicial district of which Coleman County
was a part. The contest was waged between Hon. Jno. W. Goodwin,
judge, who granted the continuance, and the Hon. J. O. Woodward,
his opponent; and that the continuance granted by Judge Goodwin in
this case entered into the campaign and was used against Judge Good-
win. It was also shown by several witnesses that they had heard others
speak of the case, and generally against appellant, some saying he
ought to be hanged. On the other hand, some witnesses say that they
had heard as many speak in his favor as against him. It was further
shown that there were some 1,500 or 2,000 qualified jurors in Cole-
man County; and that, in the opinion of the witnesses, appellant could
get a fair and impartial trial in the county. Sheriff Goodfellow testi-
fied that he talked with a great many people, but outside of the rela-
tives of deceased and other friends, he knew of no prejudice in the
county against appellant. In connection with the race between Judge
Goodwin and Hon. J. O. Woodward for district judge in that county,
and that the continuance of the case against appellant entered into
the campaign at the primary election, appellant proposed to show that
Judge Goodwin received a majority in every other county in the district,
and that Judge Woodward beat Judge Goodwin in Coleman County
more than two to one; that said Woodward knew nearly all of the
voters in the county who had supported him, and he knew how more
than two-thirds of the voters felt in regard to the case; that Judge
Woodward was prosecuting the case against appellant. We believe
this testimony, which was excluded by the court, should have been ad-
mitted, as it would tend to show what effect the continuance of said
case had upon the voters of said country; and in that connection would
serve to show that the same parties, Judge Goodwin and Judge Wood-
ward, the one as judge and the other as lawyer, were engaged in the trial
of the same case about which the feeling in the campaign was engndered.
We believe, under the circumstances here shown, that the venue should
have been changed. Evidently there must have been some ground for
apprehension on the part of the sheriff, when he is shown to have re-
moved the prisoner from said county on two separate occasions. On
one occasion they started out on foot and were overtaken en route by a
vehicle. We take it, that the explanation that the jail of Coleman
County was considered by the sheriff unsafe, as the reason for removing
the prisoner, was not the real reason; as, under such circumstances,
there would have been no occasion for starting the prisoner out of

jail on foot and having a vehicle to follow him four or five miles, to convey him out of the county. And in addition to this, the spirit manifested against appellant's counsel for obtaining a continuance of the case, and the excitement prevalent on that day is, to our minds, additional proof of conditions existing in that county indicating there was considerable prejudice prevalent among the people. The sheriff says he knew of no prejudice except on the part of the deceased's relatives and their friends. How numerous the relatives and friends were is not stated. In addition to all this, the heated campaign between the two candidates for the office of district judge, in which one was assailed because of discharging his duty on the bench with reference to this case and granting a continuance—shows that the case must have been thoroughly ventilated throughout Coleman County, and suggests strongly that, because the judge granted the continuance in the cause, prejudice was aroused against him in the county. All these circumstances serve to show that there was danger at least, on account of the notoriety of the case and the feeling aroused among the people of the county, that appellant might not secure a fair trial by an impartial jury in that county. In our opinion the court committed an error in refusing to change the venue. Randle v. State, 34 Texas Crim. Rep., 43; Meyers v. State, 39 Texas Crim. Rep., 500; Barnes v. State, 59 S. W. Rep., 882; Gallagher v. State, 40 Texas Crim. Rep., 296; Faulkner v. State, 3 Texas Ct. Rep., 575; Cortez v. State, 5 Texas Ct. Rep., 591; Smith v. State, 8 Texas Ct. Rep., 843.

Appellant criticises the charge of the court on murder in the second degree and manslaughter. The charge appears to be somewhat complicated, in endeavoring to apply the law to the facts. The learned judge instructed the jury that, if appellant engaged in the difficulty between his companion, Fernandez, and Horace Garrett (deceased) no matter how brought about, in a sudden transport of passion engendered by the difficulty between Fernandez and Garrett, he became excited and incapable of cool reflection and killed deceased, etc., he would be guilty of murder in the second degree. We note that he subsequently tells the jury that this would be so if the killing was not manslaughter nor justifiable homicide, as explained in succeeding portions of the charge. This, in a general way, might be true; but the court should have more definitely applied the law of murder in the second degree and manslaughter to the facts of the case. How the difficulty was brought about might have a good deal to do with the motive with which appellant entered into the difficulty between his friend Fernandez and deceased. If Fernandez was the aggressor and brought on the difficulty he would become a full participant with Fernandez. We understand the testimony shows that he was present and understood how the difficulty began. Of course, if there was any theory indicating he did not know how the difficulty began, and came up after it commenced, and he saw his friend Fernandez in danger, appellant's rights might be different in entering into the difficulty under such circum-

stances to protect his friend Fernandez.    But if Fernandez was the wrong-doer, and appellant with knowledge thereof entered into the conflict, he participated in the intent and motive of his companion.   We believe the law of manslaughter, as applicable to the facts of this case, can be presented to the jury in a way that is not complicated as here manifested.   We do not deem it necessary to further discuss these charges on murder in the second degree and manslaughter than simply call the attention of the learned judge thereto, and on another trial, should the facts be the same, he will present the issues clearly as they arise from the evidence.

For the errors discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*